Lisa Ann FELTNER, Plaintiff,

v.

Walter PARTYKA, Therese Partyka, and the Title Search Co., Defendants.

No. 3:95–CV–217RM.

United States District Court, N.D. Indiana, South Bend Division.

Oct. 8, 1996.

William J. Cohen, Thomas Steven Wilson, Jr., William Cohen, Attorney at Law, Elkhart, IN, for plaintiff.

Fred R. Hains, Debra Voltz–Miller, South Bend, IN, for defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

In September 1994, after working for The Title Search Company for about twenty months, Lisa Feltner resigned from her position. In this employment discrimination suit, Ms. Feltner claims that Title Search's part owner and vice president, Walter Partyka, subjected her to a hostile and abusive work environment during her employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2(a)(1) & 2000e–3(a), that eventually forced her to resign.

The defendants move for summary judgment on Ms. Feltner's claims and to strike Ms. Feltner's response to the summary judgment motion. Ms. Feltner moves to amend her response. For the reasons that follow, the court denies the defendants' motion to strike, grants the plaintiff's motion to amend, and grants in part and denies in part the defendants' motion for summary judgment.

## I. MOTION TO STRIKE AND MOTION TO AMEND

The defendants move to strike Ms. Feltner's response to their summary judgment motion on several bases. Ms. Feltner responds to the defendants' motion to strike and moves to amend her response in an attempt to cure the alleged deficiencies.

Ms. Feltner asserts that granting leave to file her amended response will not prejudice the defendants, will not cause delay, and serves the interests of justice because the proposed changes are not substantive and will aid the court in reaching a just resolution of her claims. The defendants did not object or respond to the motion to amend, and the court agrees that Ms. Feltner should be granted leave to file her amended response. The court grants Ms. Feltner's motion to amend, and addresses the defendants' motion to strike in light of Ms. Feltner's amended response to the summary judgment motion.

The defendants first claim that Ms. Feltner's response does not comply with District Rule 56.1 because it does not contain a "Statement of Genuine Issues." Ms. Feltner believes her original response complied with District Rule 56.1 because it contained a statement of the material facts to which she contends there is a genuine issue for trial, even if it is labeled "Statement of Facts" instead of "Statement of Genuine Issues." She also submits an amended statement of genuine issues with her amended response to the summary judgment motion.

Even if Ms. Feltner had included a statement of genuine issues, it could not have aided the court as intended by District Rule 56.1 because the defendants' statement of material facts does not contain facts material to the legal issues before the court: whether the defendants took appropriate action in response to Ms. Feltner's complaints of sexual harassment and whether the Partykas may be held individually liable. The defendants' statement of material facts makes no mention of any of the facts (or the non-existence of such facts) leading to Ms. Feltner's claim of sexual harassment, Mrs. Partyka's investigation, or any events after Ms. Feltner made her complaint. District Rule 56.1 is intended to have the non-moving party point out to the court the material facts the moving party has set forth that it contends that a genuine issue exists for trial. Because the defendants' statement of material facts is a statement of undisputed facts (e.g., when Ms. Feltner be-

gan working for Title Search, that she spoke to Mrs. Partyka about Mr. Partyka, the contents of a letter, the date she filed her claim with the EEOC, the date she resigned, and the date she received her right to sue letter) rather than facts that could support judgment as a matter of law in their favor on the legal issues of this case, the defendants made compliance by Ms. Feltner with District Rule 56.1 impossible; her disagreement with the facts set forth by the defendants does not and cannot be expected to create a genuine and triable issue of material fact. The court declines to strike Ms. Feltner's response or find her amended response deficient on this basis.

The defendants contend that three paragraphs of Ms. Feltner's affidavit are inadmissible because they are not made on the basis of personal knowledge, that Ms. Feltner's affidavit is inadmissible because it is unsworn, and that two exhibits attached to Ms. Feltner's affidavit are inadmissible because they are not "sworn or certified cop[ies] ... referred to in an affidavit," as required by Fed.R.Civ.P. 56(e). The defendants provide no explanation or argument regarding their objections to the three paragraphs (¶¶ 11, 13, and 16) of Ms. Feltner's affidavit,[1] and in any event, while ¶ 16 consists of legal conclusions that provide no assistance to the court, the court agrees with

Ms. Feltner's response to the motion to strike that the assertions contained in paragraphs are sufficiently based on her personal observations, knowledge, or feelings. And Ms. Feltner cures the deficiencies alleged with respect to her affidavit and its exhibits with her amended response brief; she affirms under the pains and penalties of perjury that the contents of her affidavit are true to the best of her knowledge, and her sworn affidavit incorporates by reference the attached exhibits. The court thus overrules the motion to strike in those respects.

The defendants also object to portions of the affidavits of Tammy Lahndorf, Tracy Benjamin, and Susan Tyler as being inadmissible because they are not made on the basis of personal knowledge. The court's decision on the defendants' summary judgment motion, however, does not rely on the affidavits of Ms. Lahndorf, Ms. Benjamin, and Ms. Tyler, so the court need not address the defendants' objections to those affidavits.

Lastly, the defendants urge the court to strike Ms. Benjamin's affidavit as extraneous because, they claim, Ms. Feltner never refers to it in her response. The court denies the motion to strike in this respect. Contrary to the defendants' assertion, Ms. Feltner refers to Ms. Benjamin's affidavit at least once in her response to the summary judgment motion and at least once in her amended re-

---

1. Paragraphs 11, 13, and 16 of Ms. Feltner's affidavit state the following:

11. Despite my lack of interest, Mr. Partyka approached me at my desk once again. Once again, Mr. Partyka told me that he had a present for me. Again, I told him that I did not want any presents from him. At this point, I was getting extremely upset and I told him to leave me alone. Still, Mr. Partyka told me that the present was a silver ring. Again, I told him I did not want the present and to leave me along [sic]. Later, Julie Rousseau, a co-employee, told me that she had gone on a marketing trip. During this trip, Walter Partyka purchased a silver ring as a present for me. Mr. Partyka had also told Julie Rousseau that he was in love with me. When Julie Rousseau told me this, I started crying because I could not handle this attention. I became so upset that I had to leave the office to regain my composure.

13. The next day, Walter Partyka followed me around the office. He continuously asked me to talk with him about the phone conversa-

tion of the previous evening. He told me over and over again that he had strong feelings for me and was attracted to me. As this conduct continued, I became more and more upset. I felt trapped. I could not complain to Terese Partyka because Walter Partyka is her husband. I had complained to other individuals at the company and nothing was ever done. Finally, I felt I had no choice, so I told Mr. Partyka that if he did not stop his conduct, I would have to pursue legal protection. After that, Mr. Partyka's attitude toward me changed dramatically. Instead of trying to be close to me, Mr. Partyka became very mean to me and said things about me to other employees.

16. Because of the pressure, humiliation, embarrassment and degrading environment I was faced with on a daily basis, the work environment was hostile and abusive at The Title Search Company. I believe this environment was created because of my sex because none of the male employees were treated this way. Because of the environment at The Title Search Company, I was forced to quit on September 30, 1994.

sponse to the summary judgment motion. *See, e.g.*, Plaintiff's Response at 3; Plaintiff's Amended Response at 3.

The defendants' motion to strike asks that the court award attorney's fees incurred in responding to Ms. Feltner's response to the summary judgment motion pursuant to Rule 56(g),[2] alleging that Ms. Feltner's submission of her own unsworn affidavit and its inadmissible documents and Ms. Benjamin's affidavit were in bad faith. The court denies this portion of the motion as well. Although Ms. Feltner's affidavit and its exhibits presented technical deficiencies, there is no evidence that the deficiencies were willful, nor of any substantive misrepresentations, and the court is not convinced that "the affidavit[ ] ... [was] presented in bad faith or solely for the purpose of delay."

## II. BACKGROUND

Title Search purports to be an Indiana corporation.[3] When the events giving rise to this suit began, defendant Therese Partyka owned 60% of the business and was its president, and defendant Walter Partyka, her husband, owned 40% of the business, and was its vice president, treasurer, and closing director.[4] Mrs. Partyka perceived Ms. Feltner as very smart and pleasant when she hired her in January of 1993 as a staff member in the closing department; she promoted Ms. Feltner to head of closings in April or May of 1993 based on her performance during her first few months. Ms. Feltner's duties consisted largely of preparing real estate closing packages, and she interacted with Mr. Partyka on a regular basis.[5] According to Ms. Feltner, when a new girl came into the closing department, Mr. Partyka would take her out for a long drive to tell them everything about his life. Mr. Partyka took Ms. Feltner on a drive when she began at Title Search, and told her "If you ever need anything, you need to come to me first. If I get too forward with you, you need to come to me first and not tell anyone else."

Ms. Feltner claims that Mr. Partyka subjected her to sexual harassment on a nearly daily basis while she worked at Title Search; Ms. Feltner believes Mr. Partyka was sexually obsessed with her. According to Ms. Feltner, Mr. Partyka constantly was in the closing department room with Ms. Feltner, staring at her and making comments, including that he liked her hair, that her painted toenails turned him on, and that she should join him at the Partykas' condominium in South Haven for the weekend. Mr. Partyka gave Ms. Feltner gifts, repeatedly asked her to lunch despite her refusals, found ways to sit near her and touch her, and told her that they could be together if she weren't with her boyfriend. This behavior also occurred, Ms. Feltner contends, in the car when the two would drive back and forth from the Merrillville office. Ms. Feltner did not want Mr. Partyka's gifts or attention and told him this on several occasions. Ms. Feltner found Mr. Partyka's attention and behavior very upsetting.

Ms. Feltner describes several specific events as evidence of Mr. Partyka's obsession with her and his creation of an abusive and hostile environment. On Valentine's Day 1993, Mr. Partyka gave Ms. Feltner a red scarf, claiming at first that it was from a secret admirer. When Mr. Partyka told Ms. Feltner the gift was from him, she became

---

**2.** Fed.R.Civ.P. 56(g) provides the following:

Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

**3.** As discussed below, Ms. Feltner claims that piercing the corporate veil to hold the Partykas individually liable is appropriate because they have not properly followed the corporate form and so are "employers" for purposes of Title VII.

**4.** Around the time when Mr. and Mrs. Partyka were legally separated in July of 1994, Mrs. Partyka became the sole owner of the business.

**5.** Ms. Feltner considered Mr. Partyka her supervisor. Mrs. Partyka considered Ms. Feltner higher in the closing department than Mr. Partyka, though Ms. Feltner did not have the authority to terminate him.

extremely upset with the attention and told him it could not continue. Mr. Partyka gave Ms. Feltner another gift following a trip he took to Houston. Mr. Partyka bought souvenirs for many of the employees and handed them out at work, though he saved a special gift to give to Ms. Feltner later that evening after following her to her car: a music box that played *The Yellow Rose of Texas.* Ms. Feltner told Mr. Partyka she didn't want the gift, but he insisted and she finally gave in, hoping that he would leave her alone.

Mr. Partyka also called Ms. Feltner at her home on March 8, 1994 and told her he couldn't stop thinking about her and was falling in love with her; Ms. Feltner told Mr. Partyka never to call her at home and hung up on him. According to Ms. Feltner, she became extremely upset as a result of the Valentine's Day gift and Mr. Partyka's phone call. Shortly after the phone call, Ms. Feltner spoke with Dave Bengs, Title Search's in-house counsel, at a company party, and told him about the phone call and that Mr. Partyka was in love with her. Ms. Feltner claims nothing was done as a result of her conversation with Mr. Bengs.

Some time later, Mr. Partyka gave Ms. Feltner a piece of paper with a picture of a ring cut from a magazine; Mr. Partyka wrote on the paper "Is this OK? Walt."[6] Ms. Feltner did not know how to respond, and walked away. Mr. Partyka persisted, approaching Ms. Feltner at her desk and trying to give her the "present." Ms. Feltner told him she didn't want any gifts from him, got very upset, and told Mr. Partyka to leave her alone. Mr. Partyka told her that the present was a silver ring; Ms. Feltner again responded that she didn't want any presents and asked him to leave her alone. Later, Julie Rousseau, another Title Search Employee, told Ms. Feltner that Mr. Partyka bought her the ring while they were on a marketing trip, and that Mr. Partyka told her that he was in love with Ms. Feltner.

Ms. Feltner reports that when Ms. Rousseau told her this, she started crying and had to leave the office to regain her composure, unable to handle the attention.

At some point, Mr. Partyka called Ms. Feltner at home again, and told her he couldn't stop thinking about her.[7] Ms. Feltner became extremely upset as a result of the call, told him to stop calling and leave her alone, and hung up on him. The next day at work, Mr. Partyka followed Ms. Feltner around, asking to discuss the previous night's phone call and repeatedly expressing his feelings for her and attraction to her. Ms. Feltner was very upset and felt trapped because if she complained to Mrs. Partyka, she would be complaining to Mr. Partyka's wife.[8] Ms. Feltner told Mr. Partyka that if he did not stop, she would pursue legal protection, after which Ms. Feltner reports that Mr. Partyka's actions and attitude towards her changed dramatically. He became mean to Ms. Feltner, and began talking about her to others, including commenting on her personal appearance and that she wanted to have his baby. On July 23, 1994, Mr. Partyka wrote Ms. Feltner a letter in which he attempted to explain his behavior: "Sorry I was so mean to you this week. I guess I don't take rejection very well." [9]

Ms. Feltner describes an incident that occurred after Mr. Partyka's change in attitude and behavior occurred. While on a marketing trip, Mr. Partyka discussed Ms. Feltner with another employee, Mark Lewandowski. Mr. Partyka told Mr. Lewandowski that he thought Ms. Feltner was denying her feelings towards him, and that he'd "just like to tie her up in the bathroom and fuck her." According to Ms. Feltner, after she heard of Mr. Partyka's statement from Mr. Lewandowski, she became scared and didn't know what to do.

Ms. Feltner talked with Ms. Rousseau about the situation, and they decided she should report it. Because she didn't want to

---

6. This document is attached as exhibit 1 to Ms. Feltner's amended affidavit.

7. Ms. Feltner states in her deposition that the second phone call to her home in which Mr. Partyka related his feelings for her occurred three weeks after the first one.

8. Title Search had no official or written sexual harassment policy in place.

9. A copy of this letter is attached as exhibit 2 to Ms. Feltner's affidavit.

go to Mrs. Partyka, she spoke with Terri Snyder, the office manager, who in turn spoke with Mrs. Partyka. Several days later, on August 20, 1994, Ms. Feltner talked with Mrs. Partyka. According to Ms. Feltner, Mrs. Partyka did most of the talking during this meeting, as Ms. Feltner believed that Ms. Snyder had already relayed the information she and Ms. Rousseau told her about the situation. Ms. Feltner claims Mrs. Partyka said that she understood because she knew what Mr. Partyka was like, that that's why she had tried to divorce him and had hired bodyguards, and that she would make sure that he wasn't in the room with Ms. Feltner. Mrs. Partyka, however, claims in her affidavit that she asked Ms. Feltner to discuss the specific problems with her, but Ms. Feltner refused to discuss the details of her allegations.

On August 22, 1994, Mrs. Partyka sent a letter to Ms. Feltner and Mr. Partyka, advising them that her allegations were being investigated to determine whether any disciplinary action would be taken against Mr. Partyka. The letter stated that Mr. Partyka was being temporarily reassigned, that he would no longer be involved in the closing department's day-to-day operations, and that he would be available for work in the closing department only upon request by the head of the closing department and at Mrs. Partyka's direction. The letter also stated that Mr. Partyka was not to contact Ms. Feltner at home.

Ms. Feltner claims that Mr. Partyka continued to harass her despite the letter. According to Ms. Feltner, Mr. Partyka continued to come into the closing department, where she often was alone. On one occasion she told Mrs. Partyka to get her husband out of the room, but Mrs. Partyka just laughed. Ms. Feltner became very frustrated, and would yell at Mr. Partyka to get out of the closing department, which other employees and Mrs. Partyka heard. Mrs. Partyka states in her deposition that Mr. Partyka knew that Ms. Feltner despised him, and that he felt the same way about her. According to Mrs. Partyka, Ms. Feltner did not respect Mr. Partyka, and would embarrass him in front of the entire company, yelling at

him, calling him an idiot, and even physically attacking him on occasion.

Ms. Feltner claims that Mrs. Partyka did nothing to stop the harassment. She knows of no investigation into her allegations, and reports that Mrs. Partyka did not question her or talk with her about her allegations after Ms. Snyder brought them to her attention. Mrs. Partyka's recollection of the events after August 22 is somewhat different than Ms. Feltner's. Mrs. Partyka claims that after August 22, Mr. Partyka went into the closing department only at Ms. Feltner's request to perform certain work tasks that she refused to do. Though Mrs. Partyka does not recall everyone with whom she spoke during her investigation into Ms. Feltner's charges, to the best of her recollection she spoke with Mr. Bengs, Ms. Snyder, Tammy Lahndorf of the closing department, and Jennifer Smithburn, a typist from the commitments department. According to Mrs. Partyka, she was told that nobody saw any evidence of harassment, and that those she spoke to all thought Ms. Feltner was abusive towards Mr. Partyka and the whole company. Statements (or letters) from employees were also obtained as part of Title Search's investigation into Ms. Feltner's allegations; because Mrs. Partyka wished to remain a "neutral party," she did not read the letters or statements, and instead forwarded them to the defendants' counsel in this case. Mrs. Partyka stated in her deposition that she determined, based on her investigation, that neither Mr. Partyka's nor Ms. Feltner's behavior justified punishment, though she states in her affidavit that she was unable to complete her investigation before Ms. Feltner's resignation on September 30, 1994.

On September 12, 1994, Ms. Feltner met with the Elkhart Human Relations Commission regarding filing a complaint against Title Search for sexual harassment, and filed her complaint with the EEOC on September 26, 1994. Ms. Feltner resigned on September 30, 1994; she claims she resigned because of the degrading and abusive environment created by Mr. Partyka's obsession with her, and the resultant pressure, humiliation, and embarrassment.

The defendants dispute whose idea it was, but at least Mr. Bengs, and possibly the Partykas, wanted Ms. Feltner terminated at some point shortly before her resignation.[10] Mrs. Partyka claims that Ms. Feltner became more nasty and rude after learning that she might be terminated.

## III. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent.

The parties cannot rest on mere allegations in the pleadings, or upon conclusory allegations in affidavits. The court must construe the facts as favorably to the non-moving party as the record will permit, and draw any permissible inferences from the materials before it in favor of the non-moving party, as long as the inferences are reasonable. The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law.

*Conery v. Bath Assocs.*, 803 F.Supp. 1388, 1392–1393 (N.D.Ind.1992) (citations omitted).

## IV. DISCUSSION

 Title VII protects against more than just economic or tangible discrimination. "When the workplace is permeated with 'dis-criminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (*quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986)). To establish a hostile work environment claim under Title VII, a plaintiff must show: (1) that she was, because of her sex, subjected to hostile, intimidating, or degrading verbal or non-verbal behavior such that her conditions of employment were adversely affected; and (2) that the defendant's response or lack thereof was negligent. *Carr v. Allison Gas Turbine Div. Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir.1994).

 In determining whether the work environment has been rendered hostile or abusive, the court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," though no single factor is required. *Harris*, 510 U.S. at 22–23, 114 S.Ct. at 371. The inquiry has both objective and subjective components: the court considers "not only the actual effect of the harasser's conduct on his victim, but also the effect similar conduct would have had on a reasonable person in the plaintiff's position." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1454 (7th Cir.1994). In addition to showing a hostile or abusive environment that adversely affected the conditions of employment, the plaintiff must show that the employer's response (or lack thereof) was negligent. An employer will be held liable only if it knew or should have known about the misconduct and failed to take appropriate corrective action. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir.1995)

---

**10.** Mr. Partyka claims that Mrs. Partyka and Mr. Bengs wanted to terminate Ms. Feltner based on Mrs. Partyka's observations and complaints she heard from other employees. Mrs. Partyka states in her deposition that Mr. Bengs wanted Ms. Feltner terminated and that her behavior got worse after getting wind of this, though she states in her affidavit that Ms. Feltner never was in danger of losing her job.

Ms. Feltner describes in her deposition that some time after she told Mrs. Partyka of her allegations, Mr. Partyka was upset and screaming at her that she needed to quit, which made her feel that her job was in jeopardy. According to Ms. Feltner, she told him she wasn't going to quit, and that he'd have to fire her, and they went back and forth several times arguing about it.

("The employer's legal duty is thus discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees."). An employer acts unreasonably if it "delays unduly or if the action it does take, however promptly, is not reasonably likely to prevent the misconduct from recurring." *Guess v. Bethlehem Steel,* 913 F.2d 463, 465 (7th Cir.1990). Whether the employer's remedial action is reasonable depends on the particular circumstances of the case, *Brooms v. Regal Tube,* 881 F.2d 412, 421 (7th Cir.1989), and is a question of fact. *Guess v. Bethlehem Steel,* 913 F.2d at 465.

The defendants contend that Ms. Feltner cannot show that Mr. Partyka's conduct was so severe and pervasive as to create a hostile working environment because her fears were based on mere office gossip, and that, in any event, Title Search took prompt and appropriate action to prevent the conduct underlying Ms. Feltner's claims from recurring. The Partykas also urge the court to dismiss Ms. Feltner's claims against them because, as individuals, they do not meet Title VII's definition of "employer" and so cannot be held liable for the alleged sexual harassment.

Ms. Feltner disputes the defendants' contentions. She claims that the circumstances of this case show, under both the objective and subjective standards, that Mr. Partyka created a severely hostile and abusive work environment based on her sex. Ms. Feltner disputes that Title Search acted promptly, arguing that because Mr. Partyka was a 40% owner of the business, his knowledge of his own statements and actions is imputed to the business. She also disputes that Title Search's response was appropriate; although Mr. Partyka was told not to enter the closing department, he did so anyway, and Mrs. Partyka knew that he did.

■ The court agrees that Ms. Feltner has raised a genuine issue regarding whether Mr. Partyka created a hostile and abusive work environment that adversely affected the conditions of her employment. Ms. Feltner describes what she perceived as Mr. Partyka's obsession with her, manifested on a daily basis in the form of comments, attempted touching, and constant attention, despite the fact that Ms. Feltner did not return his affections and told him to stop the inappropriate behavior. The court cannot say as a matter of law that the conduct Ms. Feltner describes is not frequent or severe enough to subject a reasonable person to a hostile and abusive environment. And although the bathroom comment Ms. Feltner attributes to Mr. Partyka was not made to her, it is indirect evidence of his attitude towards Ms. Feltner, and also supports Ms. Feltner's subjective fear of Mr. Partyka and his feelings. Through her affidavit and deposition, Ms. Feltner asserts that Mr. Partyka's conduct caused her severe pressure, embarrassment, and humiliation, which made her tense and caused her to yell, lose her temper, and eventually quit. Her testimony creates a genuine issue on the subjective component of the hostile work environment.

■ The reasonableness of Title Search's response to the alleged abusive environment depends on the gravity of the harassment, *Ammerman v. Sween,* 54 F.3d 423, 425 (7th Cir.1995), and Ms. Feltner has raised a genuine issue regarding the sufficiency of Title Search's response to the alleged harassment. Although the defendants contend that Mrs. Partyka acted promptly and reasonably to end the alleged harassment once Ms. Feltner brought it to her attention, Ms. Feltner argues that Title Search is accountable for Mr. Partyka's actions from the time they began, and Title Search should have acted sooner. As Ms. Feltner points out, Mr. Partyka was more than an employee of Title Search; as an owner, officer, and high-level supervisor, he was Title Search's agent, and Title Search therefore had the same knowledge of his behavior that he had. Title Search admits that nothing was done until after Ms. Snyder and Ms. Feltner approached Mrs. Partyka, and it is for the jury to decide whether Title Search should have acted earlier.[11] Even if

11. Along the same lines, Ms. Feltner also has presented evidence that she told Mr. Bengs of the alleged harassment earlier, but nothing was done, and that Title Search had no policies or procedures in place to prevent sexual harassment or to assure incidents were reported and dealt with, except for Mr. Partyka's alleged instructions to the women in the closing department to come to him first if they thought him too

she couldn't show that Title Search's response was negligently late, Ms. Feltner may be able to show that even when she brought Mr. Partyka's conduct to Mrs. Partyka's attention, the action taken was not "reasonably likely to prevent the misconduct from recurring." *See Guess v. Bethlehem Steel*, 913 F.2d at 465. The August 22 letter instructs Mr. Partyka not to enter the closing department except in special circumstances, but according to Ms. Feltner, Mr. Partyka did not stay out of the room as instructed, and Mrs. Partyka knew of this and even laughed about it.[12] The court cannot find as a matter of law that Title Search's response to the alleged harassment was reasonable.

The defendants' summary judgment motion is well-taken, however, with respect to the individual liability of the Partykas. In *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1279 (7th Cir. 1995), the Seventh Circuit rejected the notion of individual liability under the Americans with Disabilities Act. Title VII and the ADA share the same definition of "employer",[13] and the Seventh Circuit made the same finding with respect to Title VII in *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir.1995). Though the issue whether the owner of the business in *AIC Security* could be held liable as the business's alter ego was forfeited because it was not raised before the district court, the Seventh Circuit addressed it in dicta in a footnote:

> The EEOC also argues that even if individuals cannot be liable under the ADA, [the defendant] can somehow be liable as [the employer]'s "alter ego." ... [W]e see no good reason why it should make any difference for our analysis whether [the defendant] was [the employer's] alter ego. She might be effectively liable if the corporate veil were pierced, and as sole shareholder she will necessarily absorb the pinch from [the employer's] liability, but as to her individual capacity liability it does not matter even if she was [the employer's] alter ego.

75 F.3d at 1282 n. 11. Though this clearly hints at what the Seventh Circuit would decide if directly faced with the issue, the court recognizes that Seventh Circuit dicta is not binding authority. However, the only contrary authority Ms. Feltner presents, *Ruich v. Ruff, Weidenaar & Reidy, Ltd.*, 837 F.Supp. 881 (N.D.Ill.1993), was decided before the Seventh Circuit addressed the question of individual liability in *AIC Security* and *Williams*, and is based on cases effectively overruled by *AIC Security*. *Ruich* does not stand for the proposition that an individual may be held liable under Title VII if the plaintiff can show that circumstances warrant piercing the corporate veil. As the court noted in *AIC Security*, the Partykas (depending on which Partyka currently owns what portion of Title Search) may have to "absorb the pinch" from any liability found on Title Search's part, especially if the corporate veil is pierced at some point, but this does not lead to the conclusion that the Partykas may be individually liable under Title VII, as they are named in this suit.

## V. CONCLUSION

For the foregoing reasons, the court DENIES the defendants' motion to strike (filed July 26, 1996 (# 33)), GRANTS the plaintiff's motion to amend (filed Aug. 13, 1996 (# 34)),

---

forward, which itself could reasonably be considered an inadequate reporting mechanism.

12. The letter's instruction to Mr. Partyka to stay out of the closing department does not automatically render his presence there harassing. Ms. Feltner's affidavit does not address what specific behavior occurred after the August 22 letter. In the portions of her deposition provided to the court, Ms. Feltner states that Mr. Partyka would not stop coming into the closing department; "he was always in there" although "he wasn't supposed to have anything to do with the Closing Department." Feltner Dep. at 35. If Ms. Feltner had not created a genuine issue regarding whether Title Search should have responded sooner, it is not clear whether her claims that Mr. Partyka continued to come into the closing department, without any claim that his conduct was objectively or subjectively harassing, could have saved her from summary judgment. Because the reasonableness inquiry looks to the totality of the circumstances, the court makes no partial findings as a result of this observation.

13. "Employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees ... and any agent of such person." *See* 42 U.S.C. § 12111(5)(A) (ADA); 42 U.S.C. § 2000e(b) (Title VII).

and GRANTS IN PART and DENIES IN PART the defendants' motion for summary judgment (filed Mar. 8, 1996 (# 15)), GRANTING summary judgment on the plaintiff's claims against defendants Therese Partyka and Walter Partyka, and DENYING summary judgment on the plaintiff's claims against defendant The Title Search Company.

SO ORDERED.